United States District
Court of Connecticut

Arnold Devalda #234405      Civil Action:
V.      #_____
Warden Stephen Faucher
Warden Bowles
Deputy Warden Blanchard
Capt. John Doe/Jane Doe
Dr. John Doe

## Complaint:

This is a civil action complaint authorized by the 42 U.S.C Section §1983 to Redress the deprivation of my rights under the First, Fourth, Eighth, Fourteenth amendments and Federal and State Constitutional torts for intentional and neglect torts for failure to protect, deliberate indifference, cruel and unusual punishment, unconstitutional condition of confinement, etc. This complaint is being filed in accordance with section §1983, which my rights are secured by the Constitution of the United States. The court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C section 1367. This court has jurisdiction over plaintiff state law claims 28 U.S.C section 1331 and 1343 (A)(3). All defendants were under color of state law when these incidents had occurred, and all defendants are being sued in their official and individual capacities. Which plaintiff seeks monetary, and any other relief this court may deem just.

1

## Parties:

1. Plaintiff Arnold Devalda #234405, is a citizen of Connecticut, and is imprisoned at Brooklyn C.I., address is Brooklyn C.I. 59 Hartford Road, Brooklyn CT 06234.

2. Defendant Stephen Faucher, is the Warden at the time of this incident occurred, and acted under color of state law, and he is being sued in his official and individual capacities, work for department of corrections, 59 Hartford Road, Brooklyn, CT 06234-Brooklyn Correctional Facility.

3. Defendant Bowles, is the Warden at Northern C.I. when incident had occurred, which he acted under color of state law, and being sued in his official and individual capacities, he works for department of corrections, and his address is 287 Bilton Road, Somers CT, 06071-Northern C.I.

4. Defendant Blanchard, is the Deputy Warden in this matter when incident had occurred, which she acted under color of state law, being sued in her official and individual capacity. She works for department of corrections, her address is Brooklyn C.I. 59 Hartford Road, Brooklyn, CT 06234

5. Defendants Dr. John Doe, and Capt. John Doe/Jane Doe, which these defendants are not identified yet, but acted under color of state law where incidents occurred, being sued in their individual capacities, work for Department of Corrections at Brooklyn Corrections.

## Facts:

6. In March 2020, It, was well known that the Corona Virus had hit the United States hard. It was beyond debate that the Covid-19 virus would seriously sicken individuals affected, or even worse kill.

7. Fernandez-Rodriguez V. Licon-Vitale, 470 F.Supp, 3d323, 349 (S.D.N.Y. 2020) (observing that within a few months after the covid-19 pandemic first began in the United States, "it [was] beyond debate that the [virus][was] a disease that [could] seriously sicken and even kill those who suffer from it."

8. Which here in this matter, the defendants had known that prisons are amplifiers of infectious diseases. Defendants Dr John Do, Blanchard, Faucher, Bowles, Capt. John and Capt Jane Doe, had deliberately failed to act to mitigate the spread of Covid-19 throughout the correctional facility by deliberately ignoring the Goveners executive orders and the C.D.C. guidelines for prisons for masks mandates, separating Covid infected inmates away from healthy inmates, and allowing sick staff members to work in inmates housing units to maliciously spread and expose me to the Covid-19 virus deliberately so that it could work its course through the correctional facility at Brooklyn Corrections.

9. Nonetheless, while the United States had prepared for the Covid impact; defendents Faucher, Blanchard, Bowles, Capt John Doe, and Capt Jane Doe, Dr John Doe, had left the plaintiff to fend for himself in a deliberate indifference and reckless disregard for my health and safety.

10. Defendants had intentionally failed to apply reasonable measures to mitigate the spread of Covid-19 with a reckless disregard for my safety which exposed the plaintiff to Covid-19 virus.

11. In March and April 2020, while the State of Connecticut Govener had executed emergency orders of social distancing, mask mandates, quarantine covid infected individuals, no groups larger than 10 people at a time, wash hands, etc. Defendants Faucher, Blanchard, Capt. John Doe, Capt. Jane Doe at Brooklyn C.I. had allowed correctional staff and correctional officers to enter into the facility to work in the inmate housing units without wearing masks. Correctional officers are not forced to wear masks mitigate the inmate's exposure to Covid-19, which the plaintiff had written requests to the defendants and requested the correctional staff to follow the mask mandates which the plaintiff request was ignored. Moreover, upon plaintiff personally speaking to the defendants in person; the defendant Blanchard, Faucher, Capt. John Doe, would ignore my pleas for help to enforce mask mandate.

12. Further, defendants Dr John Doe, Faucher, Blanchard had deliberately failed to monitor their correctional staff who were sick with covid-virus, and who were A-sympotmatic; which were positive for Covid-19, but who showed no symptoms, were still allowed to work at the Brooklyn facility because they assumed that A-symptomatic individuals could not infect others. Which I personally witness my housing unit officers state that "they were still allowed to work with low-fevers-A-symptomatic." Which at this time in April 2020 during the height of the pandemic, serious precautions should have been taken more seriously because the defendants and staff were assuming A-symptomatic individuals like correctional officers could not infect inmates. Without all the data, not yet complete at this time in April 2020, the defendant's failure to act according to the Govener's executive orders and the C.D.C. guidelines for prisons was reckless and place me in danger to catch Covid-19.

13. Which in April 2020, defendant Faucher, Blanchard, Capt. John Doe, Capt. Jane Doe were allowing sick correctional officers who were A-Symptomatic to enter into the Brooklyn Correctional Facility without mask, and work around inmates within inmates housing units to intentionally expose me and other inmates to COVID-19 virus with a reckless disregard for my health and safety. The correctional officers were not even wearing a mask at the times when it was a mask mandates, and yet still up to this very present in 2021. I was not free, I am incarcerated; therefore, inmates are not the ones bringing in Corona virus into the facility which defendants has failed to protect me with a deliberate indifference which exposed me to Corona virus. "See Farmer V. Brennan, 511 U.S. 825, 834 (1994)."

14. More importantly, despite the defendants being aware that prisons are the amplifiers for infectious diseases... In March 2020 through April 2020, defendants had continued to keep housing the plaintiff in an overcrowded housing units.

15. For example, Brooklyn C.I. has 4 dorms, each dorm has 19 cubes, each cube has 6 inmates per cube. However, cubes were originally created for 3 to 4 inmates but the D.O.C. has stuffed (2) additional bunk beds in these cubes over time. Which cubes now house (6) six inmates which has caused overcrowding in housing units and created hazardous living conditions which the COVID virus can spread more quickly and more dangerously. Inmates are sleeping about 3 feet on top of each other-head to head, and 2 feet apart...There is not any social distancing at all. All cubes were filled with inmates. Masks were not given to inmates until May 2020 even though the COVID pandemic had hit the prison system badly in March and April of 2020. Despite the Commissioner mask mandate in April 22, 2020; The Commissioners mandate was too late, and the Commissioners mask mandate was just on paper- white noise...which defendants did not enforce at all in Brooklyn C.I. Defendant Faucher, Blanchard, and Capt. John Doe did not enforce the mask mandate at Brooklyn C.I.

16. However, on May 18, 2020 at approximately 9:00 a.m., the medical staff and Dr John Doe at Brooklyn Corrections had started taking the inmates body temperatures and vitals. However, the medical staff should have been taking COVID-tests, instead of vitals under the circumstances; because some inmates who were sick did not show any symptoms and were A-Symptomatic, which the A-Symptomatic inmates were not being truthful about how they really felt because of being afraid of quarantine at Northern C.I. Which body temperature checks and vital checks was not effective to mitigate the risk of exposure to COVID-virus meaningfully. Which A-Symptomatic staff and inmates were left in healthy inmate housing units to expose others to COVID-19...for months, through March 2020 and May 2020. Which the defendants had known what was happening; but deliberately failed to act reasonably. Inmates who did express to staff about their sickness was hauled off to Northern C.I. as a punishment. "No medical treatment at all".

17. On May 18, 2020, the medical staff had come into my housing unit to do temperature checks; my temperature was high along with a couple other inmates. I was told to go to the gym. When I reached the gym, there were around 21 other inmates whom all had COVID-19. None of the inmates were quarantined or separated. Inmates were coughing and choking all over the place on the floor of the gym. I was locked in the gym for days with these COVID infected inmates before being tested for COVID, which I was placed with COVID infected inmates without any positive could test results.

18. However, I slept in the gym on the floor for a couple of days and then I was transferred to Northern C.I. which is a high level maximum security prison in the history of Connecticut. Which in 2020, the Federal District Courts has ruled Northern C.I. as inhumane and unconstitutional. Northern C.I. has a history of abuse of inmates.

19. Nonetheless the Brooklyn Corrections Medical staff, Dr. John Doe, Blanchard, Faucher, Bowles, Capt. John Doe had used Northern C.I. to intimidate inmates to keep quiet about the Corona virus symptoms. Which if an inmate who does test positive, or showed signs of raised body temperature will go to Northern C.I. At first, inmates would be sent to the Brooklyn C.I. gym to sleep on the floor; and then given a COVID test, then the inmate would be sent to Northern C.I. for corporal punishment. Inmates who witnessed the procedures that is being used against sick inmates become afraid what will happen to them if they become sick...so inmates who are A-Symptomatic keep their mouth shut and do not say anything to avoid Northern C.I. but they stay in the units and expose others because of fear. This procedure adopted by the defendants was to manipulate the COVID cases to give the appearance to the public as though Brooklyn C.I. had little COVID cases so that the inmate's family members would not complain nor would the A.C.L.U complain to the courts. You could tell by the defendant's methods that they were manipulating the COVID case numbers within the inmate population at Brooklyn C.I. Rather than offering the entire inmate population COVID tests at once; the COVID test would only be administered to inmates who may have showed signs of sickness...more importantly, mass COVID testing until some-time, in June 2020 until after the COVID infected inmates were sent to Northern C.I.; which COVID testing for prisons should have been done in March 23, 2020 as the C.D.C guidelines advised prison administrations. Which the tactics the defendants had used under the false pretense to protect inmates from coronavirus was nothing but a method to install fear and intimidation inot the inmates to stop inmates from reporting their health issues with the threat of Northern C.I. which I personally heard correctional officers brag about how to keep the COVID cases down with the threat of Northern C.I. Some staff and the defendants had actually treated coronavirus as though it was a common cold. Which I witnessed these accounts.

20. At the beginning of the pandemic, I experienced first-hand that the defendants and the other correctional staff had treated coronavirus as a common cold. Which the defendant's failure to act reasonably was reckless

6

and deliberately exposed me to COVID-19 virus. Instead of protecting me, they intentionally exposed me which I was in fear for my life because I have underlying issues.

21. In retrospect, May 18, 2020 the medical staff had taken my vital signs and my temperature and the medical staff stated that I had to leave my housing unit and go to the gym for a couple of days because my vitals had showed that I had a high temperature and elevated heart rate. I was ordered to leave my housing unit and head to the gym, which at some time later or the next day in the gym I was then given a COVID test which my test did yield a positive for COVID.

22. Approximately (3) three days I lived on the gym floor...for (3) days I lived in a plastic box on the floor. More-over I was not allowed to shower or bathe. I couldn't clean myself or clean my dirty clothing. I was sleeping on the floor with (21) other inmates who also had COVID and who also could not shower or clean themselves. Inmates who were in the gym sleeping were urinating on themselves and on the floors and were very sick. I was denied soap and cleaning supplies to wipe down or clean my sleeping area. There was poor ventilation, no toilet paper, etc. I was denied the basic human needs and I was exposed to COVID which I would not have otherwise been exposed if not for the defendants failure to take prevenitive measures to ensure my safety and adequately screen staff and inmates when they were aware of the pandemic would hit the prisons in January 2020.

23. However, after the plaintiff had endured the unconstitutional conditions of the gym for (3) days, on May 21, 2020 the plaintiff was transferred to Northern C.I.

24. Once at Northern C.I., my health declined badly, whereas I complained about my breathing, the so called medical treatment had amounted to no treatment at all. I stayed at Norther for (12) days. I repeatedly complained about my breathing to Warden Bowles and the medical staff; I was left in a cell to let the virus work its course, which defendants denied me reasonable medical care. I spoke to Warden Bowles on two occasions about the conditions which he stated that "he does not care about my complaints or grievances, and told me to deal with it". I was not provided with breathing treatments, medications for my severe migraines, no hot fluids to bring down my fevers, and dehydration, chills and aches...I had temporary loss of hearing, unbalanced. I was forced to eat on the floor, I was denied exercise time. At Northern I was denied cleaning supplies to clean my cell, I was placed in the cell with another inmate named "Roseboro" who had COVID badly. I was denied clean sheets for (12) days. I was denied the human basic needs at Northern which was unjustified. Defendants used cell-mates to watch over one another during quarantine rather than the medical staff. Quarantine was punishment because there was no medical treatment at all. In addition, I was forced to use my socks as toilet paper. At Northern, defendant Bowles ignored my pleas for assistance. Plaintiff grieved and filed complaints against both facilities for unconstitutional conditions of

7

confinement and none of my complaints were processed due to defendants frustrated and impede my administrative remedies.

25. In view of the past, in March 2020 through May 2020, I observed at least 28 inmates in my housing unit test positive for COVID before I caught COVID. I also observed 8 correctional staff come to work testing positive for COVID and working sick. However, defendants Faucher, Blanchard, Capt. John Doe, medical staff at Brooklyn C.I. did not take any preventative measures to protect me from being exposed to corona virus and failed to adequately screen inmates and staff with a deliberate indifference to my health and safety.

26. Back in March 2020, I personally spoke and complained to Warden Faucher and Blanchard about the conditions which had existed at the time which had existed at the time which a sick inmate requested to see medical and was ignored by these two defendants as though the corona virus is a common cold.

27. Nonetheless, I spoke to defendants Warden Faucher and Blanchard about the fear for my life because sick correctional officers were sneezing and coughing with symptoms and still allowed to work and sick inmates were still allowed to be in general population. Regardless of mild symptoms, sick individuals should have been quarantined early in March 2020 to protect me and others from exposure. Additionally, it is well established in the second circuit the "prison officials have an Eighth Amendment duty to protect inmates for exposure to communicable disease". See Martinez-Brooks V. Easter, 459 F. Supp.3d 411, 439 (D.Conn.2020) (citing Jolly V. Coughlin, 76 F3d 468, 477 (2d cir.1996)) ("[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease"); Lareau V. Manson, (51F. 2d, 96, 109(2d cir. 1981)("[F]ailure to adequately screen newly arrived inmates for communicable disease" represents an "(Omission) sufficiently harmful to evidence deliberate indifference to serious medical needs" (quoting Estelle V. Gamble, 429 U.S. 97, 106 (1976).

28. Morever, defendants Warden Faucher, Blanchard, and Capt. John Doe were deliberately cross-contaminating the dorms by intentionally placing sick inmates and sick correctional staff in healthy housing units which exposed me to the COVID virus and recklessly disregarded my health and safety. Which, defendant's actions were not done for the safety and security purposes of the prison to maintain order. Defendants actions was done to inflict harm and intimidation and recklessness.

29. Plaintiff has exhausted all administrative remedies with respect to all claims, and all defendants, which defendants had actively frustrated and impeded the grievance process so that I could not use the grievance procedures.

30. Therefore, all defendants are sued in their official and individual capacities for exposing plaintiff to an unconstitutional condition of confinement, and failing to protect, and other issues in violation of my 8th amendment rights of the United States constitution.

31. Plaintiff has submitted <u>Exhibit-A</u>; As example of the unconstitutional conditions of confinement the plaintiff had endured...The plaintiff has been injured indeed.

### Claims for Relief:

Count One:
### Unconstitutional Condition of Confinement

36. Plaintiff hereby realleges, and incorporate by reference in paragraphs (1-31) as fully restated herein...

Dr. J. Doe, Faucher, Blanchard, Bowles, had denied the plaintiff his basic human needs to clean his self, shower and mitigate the spread of COVID-19 virus. Moreover, plaintiff was denied toilet paper to clan himself at Northern. These defendants failed to provide plaintiff with reasonable medical attention and left plaintiff in a hazardous dangerous living conditions in violation of plaintiff's 4th, 8th, 14th amendment rights of the United States constitution. Which defendant Faucher, Blanchard, had exposed the plaintiff to catch COVID-19 virus in violation of my 8th amendment. Defendants are sued in both official and individual capacities in violation of my 4th, 14th amendments. Dr. John Doe had assisted these defendants.

Count Two:
### Deliberate Indifference

Plaintiff hereby realleges, and incorporates by reference in paragraph (1-31) as fully as restated herein...

Dr. J. Doe, Faucher, Blanchard, Capt Jane and John Doe, Bowles had deliberately failed to protect plaintiff from catching COVID-19 virus and intentionally exposed the plaintiff to COVID by their actions of failure to act and failure to tell staff who are sick to stay home. Moreover, defendants Capt. John and Jane Doe, Blanchard, Faucher, Bowles had the authority to force inmates and staff to wear mask's in the facility but turned a blind-eye and did not enforce the mask mandate. Defendants had placed sick inmates with healthy inmates intentionally with a reckless deliberate indifference which cause the COVID-19 virus to spread because they believed that COVID was a common cold. Further, defendants had denied plaintiff cleaning supplies to mitigate COVID which they failure to adequately address plaintiff complaints has led me to catching Coronavirus with deliberate indifference. Which defendants are sued in their official and individual capacities. Defendants had ignored all orders and advise from the C.D.C., and executive orders from the Govener about mask which till this very day, correctional staff are still

not wearing mask in the housing units in Brooklyn in violation of my 8th amendment rights, of deliberate indifference.

Count Three:

### I.I.E.D.

Plaintiff hereby realleges and incorporate by reference in paragraphs (1-31) as fully restated herein...

All defendants had deliberately intended to inflict intentional infliction of emotional distress on the plaintiff by causing the plaintiff to endure catching COVID-19, and denying the plaintiff minimal civilized measures of basic human needs during the COVID pandemic in violation of plaintiff civil rights and torts. Which defendant Blanchard, Faucher, Bowles, Capt John and Jane Doe, was aware of their unconstitutional conduct but refused to correct the situation and refused to assist the plaintiff. Which defendants had intentionally exposed the plaintiff to COVID recklessly because they believed COVID was a cold when it was beyond debate that COVID could kill. Defendents are sued in their official and individual capacities. Plaintiff did catch COVID-19 and had suffered severe emotional distress by the defendant's actions, and caused the plaintiff severe anxiety, depression, fear of death, and psychological torture...

Count Four:

### Failure to Protect

Plaintiff hereby realleges, and incorporate by reference in paragraphs (1-31) as fully restated herein...

Dr. J. Doe, Faucher, Blanchard, had a duty under the 8th amendment of deliberate indifference to protect the plaintiff from being wrongfully exposed to COVID-19, but deliberately failed out of sheer ill will and recklessness in violation of my 8th amendment. Which defendants had the authority and duty to stop the plaintiff from being recklessly exposed to COVID-19 if they would have enforced staff to wear mask, and required all staff who knew they were sick to stay home at minimal; rather, defendants allowed sick staff to come in and work despite having low fevers, or being A-Symptomatic. Which failure to act had at minimal exposed the plaintiff to corona virus. Which the plaintiff did catch COVID-19. Which defendants had violated my 8th amendment rights by failing to reasonably give good faith effort to mitigate the spread of COVID through the facility. Therefore, defendants are sued in their official and individual capacities. Defendants had chosen job security over inmate's health and safety so that staff could get overtime and more pay for COVID etc.

Count Five:

### Cruel and Unusual Punishment

Plaintiff hereby realleges and incorporates by reference in paragraphs (1-31) as fully restated herein... Defendants Dr. John Doe,

Dr John Doe, Blanchard, Faucher, Bowles, Capt John and Jane Doe actions was forced on the plaintiff to intentionally exert cruel and unusual punishment and intimidation on the plaintiff in an effort to make an example out the plaintiff for getting COVID. Defendants unconstitutional behavior was not about protecting the plaintiff. Defendants actions was to instill fear in plaintiff and to cause harm by deliberately denying the plaintiff his basic human needs of no showers, no toilet paper, no cleaning supplies to clean, no clean clothes, no wash rags, etc. Which defendants' actions violated my 8th amendment rights. The plaintiff was moved to Northern C.I., and placed in a cell with another inmate who had a different stronger strain of COVID, which the cell was not clean, dirty. I was not even given adequate medical attention and care. I was locked in a cell to let the virus work its course which reasonable medical care was denied. More importantly, when the COVID crisis had hit the prison population at Brooklyn rather; rather follow C.D.C. guidelines of mass COVID testing to at least try to protect and mitigate the spread of COVID-19, the defendant had only did random temperature checks on inmates to manipulate COVID-case instead of COVID-testing in violation of C.D.C guidelines which created dangerous hazardous living conditions of confinement and cruel and unusual punishment.

## Damages Award

- Cost of Lawsuit
- Waiver of Cost of Incarceration
- Statement defendants had violated my rights
- Future Income Losses

## Damages:

- Dr John Doe $250,000.00
- Faucher $250,000.00
- Bowles $250,000.00
- Blanchard $250,000.00
- Capt. John Doe $100,000.00
- Capt Jane Doe $100,000.00

12

Verification:

I hereby declare under penalty of perjury pursuit to section 28 U.S.C §1746, that the information within this complaint is true and correct.

Date: 9-22-21     Sign: *[signature]*





# DOC: Nearly half of Brooklyn prison population tests positive for coronavirus

By John Penney
jpenney@norwichbulletin.com, (860) 857-6965
Posted Jun 29, 2020 at 6:49 PM

Nearly half of those incarcerated at a Brooklyn-based prison tested positive for the coronavirus, according to newly released state Department of Correction mass testing figures.

The testing, the first such mass initiative undertaken by the department, began on May 13 at the Osborn Correctional Institution in Somers and concluded Thursday at the Newtown's Garner Correctional Institution. The testing yielded 832 positive cases — or a rate of 9% — among the 9,504 prisoners tested in 14 facilities, including those in Uncasville and Brooklyn.

**Note to readers: All of The Bulletin's coverage of coronavirus is being provided for free to our readers. Please consider supporting local journalism by subscribing to The Bulletin at https://www.norwichbulletin.com/subscribenow.**

At the Brooklyn Correctional Institution in Brooklyn, 132, or 45%, of the 295 prisoners tested, received a positive result — the highest positive rate of all 14 state correctional facilities. Despite 100% of all the prison's inmates opting to be tested, the Brooklyn facility's population resulted in third-lowest number tested when compared all the state's prisons.

At Uncasville's Corrigan-Radgoswski Correctional Institution, 152, or 16%, of the facility's 960 prison population tested postive. Like in Brooklyn, all of Corrigan's inmates opted to be tested.

Health officials said the positive case numbers reported by the DOC are being folded into the state Department of Public Health's tracking system and added to the towns where prisons are located.

For example, the state on Monday reported there were 126 cases of COVID-19 in the Town of Brooklyn and 290 in the Town of Montville. But those figures include the DOC cases at the Brooklyn and Corrigan correctional institutions and don't accurately reflect the virus picture in the general, non-incarcerated public.

The 20-case difference in Brooklyn's numbers is likely due to a delay in case updates between the two state agencies, officials said.

Sue Starkey, director of health for the Northeast District Department of Health, said the state is exploring a way to aggregate the prison and town case numbers to give residents a clearer sense of what's going on in their communities.

"Usually, you want to separate cases involving places like prisons or nursing homes from the rest of the population to give people a better picture of their relative risk," she said.

Starkey said residents can take some valuable lessons from the prison case numbers.

"What you see in a prison, with its close, cramped quarters, is the same thing that can happen among families," she said. "That's why everyone needs to take steps to protect themselves and others so you're not taking this back home with you"

No prisoners at York Correctional Institution in Niantic, the state's female-only correctional facility, nor at the Manson Youth Institution in Cheshire, have tested positive.

The latest numbers did not include the 510 prisoners who contracted the virus before the mass testing began, officials said.

All but two of those who took part in the mass testing were asymptotic and remained so throughout a 14-day isolation and monitoring period.

Department officials said the number of inmates who opted to be tested was in the "high 90s," but did not include the Osborn facility. Agency healthcare staff will be re-offering tests to the roughly 440 prisoners who previously opted out of

7/8/2020  DOC: Nearly half of Brooklyn prison population tests positive for coronavirus - News - The Bulletin - Norwich, CT

Case 3:21-cv-01274-AWT   Document 1   Filed 09/23/21   Page 17 of 17

testing. The department is aiming for a 90% overall facility compliance rate for the tests.

Out of approximately 10,000 incarcerated individuals, three are still recuperating from coronavirus-related symptoms.

As of Monday, 593 correctional officers have been tested for the novel coronavirus, with all but one result coming back negative, the department said. Mass testing of department staff is ongoing.

Since March, 380 of agency's 6,000 staff members have tested positive for the virus with all but three returning to work. Those three are expected to be back on the job in the coming weeks, officials said. It has been a month since a staffer has tested positive.

But the department expects its testing numbers to jump "dramatically" soon with the State Employees Bargaining Agent Coalition entering into an agreement with the state's Office of Labor Relations to mandate Covid-19 testing of all DOC staff members who have direct contact with the offender population.

The test results were released as the number of prisoners in state facilities continues to drop. Officials said the number of incarcerated individuals will drop below half its February 2008 all-time high number of 19,894 "within the next few days."

The department's inmate population decreased by 2,400 since March 1, a dip officials attribute to the "responsible discretionary" release of eligible offenders.

"Having spent more than 30 years with the Department of Correction, I was here when the population ballooned and now I am seeing it shrink like never before. In short, I have learned to expect the unexpected," DOC Interim Commissioner Angel Quiros said in a press release. "As we continue to manage and prepare for future obstacles related to the Covid-19 pandemic, one thing that I am certain of is the ability of the agency's amazing staff to adapt to, and overcome any future challenges."

*Editor's note: The number of incarcerated prisoners in the state was listed incorrectly in a previous version of this story.*